IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SHARON GRISWOLD, MD MPH, *Plaintiff*, | : <br> : <br> : |
| v. | : CIVIL ACTION NO. 2:22-cv-00568 <br> : <br> : |
| DREXEL UNIVERSITY, *et al.*, Defendants. | : JURY TRIAL REQUESTED <br> : <br> : |

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF DEFENDANTS
DREXEL UNIVERSITY AND DREXEL UNIVERSITY COLLEGE
OF MEDICINE'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendants Drexel University ("the University") and Drexel University College of Medicine ("DUCOM"), by and through undersigned counsel, hereby submit the following statement of undisputed material facts in support of their motion for partial summary judgment.

*A. The Parties and Terms of Griswold's Employment with DUCOM*

1. Plaintiff Sharon Griswold ("Griswold") is a former DUCOM emergency medicine doctor and is currently employed by Merck and Penn State Health. *See* Griswold's Deposition Transcript ("Pltf. Dep."), attached hereto as Exhibit 1, at 17:9-16, 31:13-15, 33:6-18; Compl. [ECF No. 1] ¶¶ 19-20.

2. On or about July 20, 2007, in connection with her former employment with Defendants, Griswold was interviewed by and ultimately hired by Dr. Richard Hamilton ("Hamilton"), the Chair of DUCOM's Emergency Medicine Department, to serve as an Associate Professor of Emergency Medicine and director of the Emergency Medicine Department's simulation division. Pltf. Dep., Ex. 1, at 40:14-16.

3. In her role as Associate Professor of Emergency Medicine, which was an academic appointment with DUCOM's Department of Emergency Medicine ("Department"), Griswold was responsible for teaching medical students, residents and fellows; performing clinical service and patient care at the former Hahnemann University Hospital ("HUH"); and "perform[ing] other duties as assigned and scheduled by the Chair of [her] Department." Griswold's Appointment Agreement, attached hereto as Exhibit 2, at p. 1.

4. This role required Griswold to treat patients in the emergency room at HUH and train residents, fellows, and students on site at HUH. *See* Pltf. Dep., Ex. 1, at 19:3-14, 135:2-6 (noting that treating patients in HUH's emergency room was one of her primary duties), 221:2-5 (noting that HUH's residents were forced to find new placements after the announcement that HUH would close in the summer of 2019). Griswold was expected to spend sixty percent of her time on these clinical activities. *See* the letter addressed to Griswold dated April 11, 2007, attached hereto as Exhibit 3.

5. Griswold held other roles with Defendants. *See* Pltf. Dep., Ex. 1, at 44:21-45:23; Compl. ¶ 25-28.

6. In or around May of 2019, Hamilton recommended Griswold for a secondary appointment as a professor of Anesthesia and Perioperative Care and Defendants awarded Griswold with that appointment. Compl. ¶ 28; Pltf. Dep., Ex. 1, at 47:20-48:6; *see also* the letter notifying Griswold notifying her of this appointment, attached hereto as Exhibit 4.

7. Griswold also served as the Director of the Emergency Medicine Department's Simulation Center since at least 2008. Griswold Dep., Ex. 1, 37:23-24; *see also* Hamilton's letter recommending Griswold for the unqualified rank of Associate Professor of Emergency Medicine,

dated February 26, 2008 (noting that Griswold is the Director of the Simulation Center), attached hereto as Exhibit 5.

8. Griswold was promoted to the rank of Professor of Emergency Medicine in 2014 on Hamilton's recommendation. *See* the letter dated May 4, 2016, attached hereto as Exhibit 6.

9. In her capacity as Professor of Emergency Medicine and Director of the Department of Emergency Medicine's Simulation Division, Griswold reported to Hamilton. Pltf. Dep., Ex. 1, at 44:17-19.

10. Griswold also served as Associate Dean of Graduate Medical Education from April of 2016 to January of 2019, a role that required her to report to senior administrators Daniel Schidlow ("Schidlow") and Valerie Weber, then-vice dean for undergraduate medical education. Griswold Dep., Ex. 1, at 44:21-23; *see also* Defendants' Response to Plaintiff's Interrogatory No. 11, attached hereto as Exhibit 7.

11. At the time of her separation from Defendants following the closure of HUH, Griswold earned an annual salary of $260,000.00. *See* the wage statement dated December 20, 2019, attached hereto as Exhibit 8 (noting that Griswold earned $260,000.04 in base pay (excluding bonuses) during the 2019 calendar year).

12. Approximately sixty percent of Griswold's salary was allocated from the Emergency Medicine Department's budget to compensate her for the work she performed as a Professor of Emergency Medicine and clinician. *See* selected portions of the deposition testimony of Melissa Richman ("Richman Dep."), attached hereto as Exhibit 9, at 14:3-7 (testifying to the labor allocation of Griswold's salary).

13. Approximately forty percent, or $104,000.00, was allocated from the Graduate School of Biomedical Sciences and Professional Studies for time Griswold spent working as the

director of the University's Master of Science in Medical and Healthcare Simulation ("MSMS") program and related certificate program. *Id.*

### B. MSMS Program

14. Griswold also founded the University's MSMS program and a related certificate program. Pltf. Dep., Ex. 1, at 45:24-3; Compl. ¶ 25.

15. These programs were introduced in 2014 and 2016, respectively. *See* the closure letter attached hereto as Exhibit 10.

16. As of January 2020, the MSMS Program was a part of the Graduate School of Biomedical Sciences and Professional Studies' Division of Interdisciplinary and Career-Oriented Programs (the "ICO"). *See* selected portions of the deposition transcript of Paul McGonigle ("McGonigle Dep."), attached hereto as Exhibit 11, at 26:8-20; *see also* selected portions of the deposition transcript of Elisabeth Van Bockstaele ("Bockstaele Dep."), attached hereto as Exhibit 12, at 27:5-28:11.

17. In her capacity as director of the University's MSMS and related certificate program, Griswold reported to Paul McGonigle, the ICO's Director. *See* Pltf. Dep., Ex. 1, at 37:7-16; Compl. ¶ 28; Bockstaele Dep., Ex. 12, at 26:7-11.

18. As of January 2020, Hamilton had no oversight of the MSMS program. *See* Bockstaele Dep., Ex. 12, at 34:11-15.

19. According to Elizabeth Van Bockstaele, the dean of the Graduate School of Biomedical Sciences and Professional Studies, the MSMS program was not profitable. Bockstaele Dep., Ex. 12, at 44:2. Then-Dean Schidlow attempted to shutter the program in late 2015 after it did not meet its target enrollment. *See* selected portions of the deposition transcript of Richard

Hamilton ("Hamilton Dep."), attached hereto as Exhibit 13, at 187:9-22; Bockstaele Dep., Ex. 12, at 49:13-50:18.

20. Hamilton and Bockstaele advocated for the program, and convinced Schidlow to give Griswold more time to increase enrollment. *See* Bockstaele Dep., Ex. 12, at 49:13-50:18.

21. Griswold was never able to grow enrollment to the point necessary to cover the programs' basic expenses. *See* Closure Letter attached hereto as Exhibit 10.

22. There were never more than nineteen (19) full- and part-time students enrolled in the MSMS program during any academic year. *See* the table of enrollment data for the College of Biomedical Sciences and Professional Students attached hereto as Exhibit 14.

23. As of December 7, 2020, there were only five part-time students enrolled in the MSMS program. *Id.*

24. Defendants sunsetted both the MSMS program and related certificate programs at the conclusion of the 2020-2021 academic year. Bockstaele Dep., Ex. 12, at 94:24-95:1.

C. **Griswold's Allegations and Internal Discrimination Complaints**

25. Griswold testified that she had a strained working relationship with Hamilton and other administrators who worked within the Emergency Medicine Department, most notably, Jamie Teufel ("Teufel"), the EMS Program Director, and Keith Kalbach ("Kalbach"), the Department Administrator. Pltf. Dep., Ex. 1, at 84:6-85:12.

26. As EMS Program Director, Teufel oversaw the University's EMT training program and various educational programs offered by the University's EMS Training Center. *See* selected portions of the deposition transcript of Keith Kalbach ("Kalbach Dep."), attached hereto as Exhibit 15, at 84:10-18.

27. Teufel assisted Griswold with certain simulations offered to residents and MSMS students. *Id.* at 85:1-4.

28. Teufel reported to Drs. Bodhan Minczak and Hamilton. *Id.* at 31:12-32:5.

29. Griswold did not report to Teufel nor did Teufel report to Griswold. *Id.*; *see also* Pltf. Dep., Ex. 1, at 82:23-83:4, 179:13-23 (testifying to her aspirations to have some authority over Teufel); Hamilton Dep., Ex. 13, at 28:24-29:3 (testifying that Teufel reported to "Dan Minczak" and that Minczak reported to Kalbach and Hamilton).

30. As the Emergency Department Administrator, Kalbach oversaw the department's finances and daily operations, including billing and purchasing, and in that role, he collaborated with Griswold and Teufel. Kalbach Dep., Ex. 15, at 32:1-5, 116:3-117:24.

31. Griswold did not report to Kalbach nor did Kalbach report to Griswold. *See* Hamilton Dep., Ex. 13, 29:4-5 (testifying that Kalbach reported to Hamilton); Pltf. Dep., Ex. 1, at 198:22-200:20.

32. Griswold and Teufel frequently shared resources, equipment, staff, and space when performing their respective job responsibilities. *See* Pltf. Dep., Ex. 1, at 108:7-14 (testifying that Teufel and Griswold shared "resources and space all the time"), 113:5-116:9 (explaining that Teufel and Griswold shared the simulation room and maintained a schedule reserving space in the room), 169:14-171:11 (testifying that EMS educators Robert "Bubba" Hamilton and Stacey Wigent performed work for both Teufel and Griswold).

33. Teufel and Griswold were frequently at odds over issues such as: scheduling and access to the simulation lab; whether EMS division employees should be assisting Griswold in the simulation lab, and to what extent; and whether Teufel had authority to reach out to simulation

product vendors on the University's behalf. Pltf. Dep., Ex. 1, at 95:22-104:8, 132:12-133:19; Plaintiff's Response to Defendants' Interrogatory 7, attached hereto as Exhibit 7.

34. Griswold testified that she believed that Teufel and Kalbach displayed a longstanding disrespect for her program and attempted to undermine her efforts to grow the MSMS program. Pltf. Dep., Ex. 1, at 95:22-104:8.

35. Griswold testified that she brought these concerns to Hamilton and that Hamilton dismissed them. Pltf. Dep., Ex. 1, at 77:10-78:14.

36. In spite of this testimony, the record indicates that Hamilton nominated Griswold to attend the Executive Leadership in Academic Medicine ("ELAM") program, a prestigious leadership program for women in medical academia, in 2018. *See* Pltf. Dep., Ex. 1, at 50:5-54:4.

37. In his letter of recommendation, Hamilton wrote:

> **1. Why are you recommending this candidate?** I am quite excited to nominate Dr. Sharon Griswold for the ELAM program because I feel she is poised to move into a high level leadership role AND be successful in this role. Sharon has been an integral part of my Department and when I first became Chair I recruited her to develop the Simulation Division. She excelled in this and accomplished a great deal, establishing a research program, an educational curriculum, and a fellowship in Simulation. Our shared vision for simulation in medicine was to create a graduate degree program in this area and really establish the science of simulation in healthcare. Sharon took that idea and with the support of the Department of Emergency Medicine was able to create a graduate level curriculum which is into it's third year. Her background in education and in postgraduate medical education made her an excellent choice for Associate Dean for Graduate Medical Education - her most recent role. She is already demonstrating that she is excelling in this capacity.

*See* the letter of recommendation attached hereto as Exhibit 16.

38. Griswold made two internal complaints during her tenure with Defendants. Compl. ¶¶ 53-56, 70-75; Pltf. Dep., Ex. 1, at 186:4-18 (testifying that she made contact with Defendants' Office of Equality and Diversity ("OED") on two occasions in 2018 and 2019). The substance of each report and Defendants' efforts to investigate said complaint are summarized below.

7

### D. Griswold's 2018 Complaint

39. On or about September 26, 2018, Griswold emailed Jennifer Gallagher, Manager, HR Service Center, and advised that she had an unidentified issue in the emergency medicine department and requested that Gallagher connect her with someone to address her concerns. *See* Pltf. Dep., Ex. 1, at 184:11-185:13; e-mail correspondence dated September 26, 2018, attached hereto as Exhibit 17.

40. That same day, Gallagher promptly connected Griswold with Kathleen "Katie" Shannon ("Shannon"), DUCOM's Human Resources Business Partner. *See* Exhibit 17; Pltf Dep., Ex. 1, at 185:10-13.

41. Shannon and Griswold spoke on September 28, 2018, and Griswold raised concerns about communication issues within the emergency department and her perceived inequitable application of rules to men and women within the department. Griswold Dep., Ex. 1, at 185:14-186:3; selected portions of the deposition transcript of Kathleen Shannon ("Shannon Dep.", attached hereto as Exhibit 18, at 48:8-53:23.

42. With respect to the latter, Griswold did not identify any specific instances of gender discrimination despite inquiry. Shannon Dep., Ex. 18, at 50:10-22.

43. Shannon followed up with Griswold on October 3, 2018, and advised Griswold that, after speaking with her supervisor Kim Gholston, she had identified ways to assist Griswold with her concerns. Shannon Dep., Ex. 18, at 56:9-58:12.

44. On October 17, 2018, Shannon contacted Lindsay Kenney ("Kenney") in OED to discuss whether Griswold's concerns warranted OED attention. *See* Defendants' Response to Plaintiff's Interrogatory No. 1, attached hereto as Exhibit 7; *see also* selected portions of the deposition testimony of Lindsay Kenney ("Kenney Dep."), attached hereto as Exhibit 19, at 67:3-

68:15.  OED oversees the University's "centralized review, investigation and resolution processes" for, *inter alia*, employee reports of sex-based discrimination, harassment, and retaliation.  *See* the University's Discrimination, Harassment, and Bias Incident Prevention Policy attached hereto as Exhibit 20, at p. 11.

45. Griswold met with Shannon and Lindsay O'Brien, then-Title IX investigator, on October 30, 2018.  *See* Defendants' Response to Plaintiff's Interrogatory No. 1, attached hereto as Exhibit 7; Pltf. Dep., Ex. 1, at 211:23-212:3.

46. Plaintiff ultimately decided against working with OED.  Pltf. Dep., Ex. 1, at 186:4-188:16.  OED complied with Plaintiff's wishes and did not initiate a formal investigation of Griswold's allegations.  *Id.*; *see also* Kenney Dep., Ex. 19, at 94:5-99:3.

47. In an attempt to de-escalate the interpersonal conflicts that existed between Griswold and her colleagues, with Griswold's agreement, Shannon mediated conversations between Griswold, Kalbach, and Hamilton in late October and November of 2018.  *See* Defendants' Response to Plaintiff's Interrogatory No. 1, attached hereto as Exhibit 7; Hamilton Dep., Ex. 13, at 138:23-139:1; *see also* Shannon Dep., Ex 18, at 86:6-101:4.

48. Teufel declined to participate in a mediated conversation with Griswold.  *See* Shannon Dep., Ex. 18, at 100:21-101:4.

49. Griswold did not contact Shannon again to raise any concerns about the emergency medicine department until June 24, 2019.  *Id.* at 135:17-136:23.

50. During this time frame, Hamilton recommended Griswold for a secondary appointment as a professor of Anesthesia and Perioperative Care and Griswold was awarded with that appointment.  *See supra* ¶ 6 and record evidence cited therein.

51. Upon Griswold's request, Hamilton also supported Griswold's request to attend a leadership development course in April of 2019. *See* the email correspondence attached hereto as Exhibit 21.

### E. *Griswold's Termination*

52. On or about June 30, 2019, several months before Griswold was placed on administrative leave and two months before she initiated her 2019 OED complaint, Center City Healthcare, LLC, the entity that operated HUH, and its affiliate, Philadelphia Academic Health System ("PAHS"), filed for bankruptcy and announced that it would be closing HUH within weeks. *See generally* the Voluntary Petition for Non-Individuals Filing for Bankruptcy filed on behalf of Center City Healthcare, LLC, Civ. No. 1:19-bk-114566 [the "Bankruptcy Matter"], at Doc. No. 1, pp. 1, 9 (June 30, 2019), attached hereto as Exhibit 22 (listing the University as a creditor);[1] *see also* the Declaration of Allen Wilen in Support of First Day Relief ("Wilen Decl.") filed in the Bankruptcy Matter, attached hereto as Exhibit 23, ¶¶ 7, 11, 45, 149.

53. At the time, PAHS and DUCOM were parties to an academic affiliation agreement that ran through June 2022. Wilen Decl., Ex. 23, ¶ 30.

54. Under this agreement, DUCOM employees served in key academic and leadership positions in HUH's educational programs, ran HUH's residency program, and provided patient care. *Id.* ¶ 31; *see also* the Limited Objection of Drexel University to Motion of the Debtors for

---

[1] Defendants have attached a number of filings associated with the proceeding *In re Center City Healthcare, LLC*, Civ. A. No. 19-11466 (Bankr. Del. June 30, 2019), to support the instant motion. The Court may take judicial notice of these records and filings as they are matters of public record and docketed in the underlying bankruptcy proceeding. *See Ieradi v. Mylan Labs., Inc.,* 230 F.3d 594, 600 n. 3 (3d Cir.2000) ("Under Federal Rule of Evidence 201 we may take judicial notice at any stage of the proceeding of a fact not subject to reasonable dispute that is capable of accurate and ready determination by resort to a source whose accuracy cannot be reasonably questioned.").

Entry of Interim and Final Orders filed in the Bankruptcy Matter [Doc. No. 66], attached hereto as Exhibit 24, ¶ 4 ("Drexel Bank. Obj.").

55. Defendants filed a lawsuit to block AAHS from closing HUH, but was unsuccessful in preventing its closure. *See* Drexel Bank. Obj., Ex. 24, ¶¶ 5-8.

56. DUCOM alleged that PAHS and its subsidiaries owed DUCOM in excess of $13 million at the time of the bankruptcy filing. Wilen Decl., Ex. 24, ¶¶ 31, 41.

57. Faced with HUH's impending closure, Defendants made the difficult decision to lay off Griswold and hundreds of other doctors and staff by January of 2020. *See* Defendants' response to Plaintiff's Interrogatory No. 7, attached hereto as Exhibit 7; Pltf. Dep., Ex. 1, at 157:24-158:6.

58. Griswold along with hundreds of other clinical faculty were notified on July 18, 2019, via a letter signed by Schidlow, that their employment with the College would end on January 14, 2020, "due to the pending closure of HUH." *Id.*; Pltf. Dep., Ex. 1, at 18:5-10, *see also* a true and correct copy of Griswold's Termination Letter, attached hereto as Exhibit 25.

59. Schidlow, Jill Tillman ("Tillman"), then-CEO of Drexel University Physicians, and Anthony Esposito ("Esposito"), then-Chief Financial Officer ("Mr. Esposito"), identified the employees who would receive termination notices. Defendants' response to Plaintiff's Interrogatory No. 7, attached hereto as Exhibit 7.

60. Griswold continued to receive her full salary through January 14, 2020, even during her period of administrative leave. Pltf. Dep., Ex. 1, 21:9-11.

F. **Griswold's 2019 Complaint**

61. On September 18, 2019, two months after receiving notice of her termination due to the closure of HUH, Griswold reached out to Shannon via email asking to "talk ASAP." *See*

Defendants' Response to Plaintiff's Interrogatory No. 1, attached hereto as Exhibit 7; *see also* the e-mail correspondence dated September 18, 2019, attached hereto as Exhibit 27.

62. Griswold informed Shannon that she continued to have issues with Hamilton and Teufel, and asked for Shannon's assistance. *See* Exhibit 27.

63. On September 25, 2019, Shannon spoke with Griswold on the phone and referred Griswold to OED to address any concerns she had regarding perceived discrimination or retaliation. Defendants' Response to Plaintiff's Interrogatory No. 1, attached hereto as Exhibit 7.

64. Jenna Perez ("Perez"), a then-Deputy Equal Opportunity/Title IX Coordinator working within OED, reached out to Griswold on September 27, 2019, to set up a meeting with Griswold to review her options under Defendants' anti-discrimination and anti-retaliation policies. *Id.* Griswold and Perez spoke by phone on September 30, 2019. *Id.*

65. Perez partnered with Shannon to assess whether Griswold's concerns were appropriate for an OED investigation and Shannon recounted Griswold's previous concerns to Perez. Pltf. Dep., Ex. 1, at 205:1-206:3.

66. Griswold's Complaint remained open at the time of her termination. Paul Apicella, the University's then-Title IX Coordinator, reached out to Griswold in January of 2020 to invite her to contact him if she wanted to continue to pursue her complaint, but Griswold never responded to the e-mail. Kenney Dep., Ex. 19, at 127:17-128:4.

67. Griswold testified that she did not receive the email but ultimately decided not to contact Drexel to continue with the investigation after speaking with her counsel. Pltf. Dep., Ex. 1, at 216:2-217:18.

### G. Griswold is Placed on Administrative Leave and Files a PHRC Complaint

68. On or about October 25, 2019, the University received a complaint from two EMS educators, Stacey Wigent and Robert Bubba Hamilton, who overheard Griswold stating that "she wanted to burn the [University's New College] Building down" and threatening Teufel and Kalbach. *See* Public Safety Report attached hereto as Exhibit 28, at p. 1; *see also* the deposition testimony of Charles Lashley ("Lashley Dep."), attached hereto as Exhibit 29, at 28:8-29:2, 67:8-13.

69. Specifically, the employees reported that Griswold stated "Fuck CNHP," "Fuck Jamie [Teufel]," "Fuck Keith [Kalbach]," "Fuck [Richard] Hamilton," and "I am just so agitated. I feel like burning this building down." *See* the witness statement prepared by Stacey Wigent, attached hereto as Exhibit 30.

70. Given that Griswold's statements were made while she was performing her role as director of the MSMS program, her actions were reported to Richman and Van Bockstaele. *See* Richman Dep., Ex. 9, at 49:7-50:22 and Plaintiff's Exhibit 77 cited therein.

71. Griswold denies making these statements and has accused Teufel, without proof, of fabricating the witnesses' statements. *See* Pltf. Dep., Ex. 1, at 139:22-145:10, 152:17-153:3.

72. On October 29, 2019, after receiving witness statements and meeting with Griswold, Defendants placed Griswold on paid administrative leave pending the outcome of a public safety investigation of whether Griswold's behavior on October 25, 2019, violated University Policy. Richman Dep., Ex. 9, at 55:16-58:9; Pltf. Dep., Ex. 1, at 21:9-11, 139:17-140:4.

73. Shannon and Van Bockstaele met with Griswold on October 29, 2019, along with Lashley and were involved in the decision to place Griswold on administrative leave pending the investigation. *See* Van Bockstaele Dep., Ex. 12, at 127:1-128:22; Pltf. Dep., Ex. 1, at 162:2-173:9.

74. Hamilton was not involved in the decision to place Griswold on Administrative leave pending the investigation. Hamilton Dep., Ex 13, at 201:1-7.

75. Griswold filed a complaint of discrimination with the Pennsylvania Human Relations Commission ("PHRC") roughly one week after being placed on paid administrative leave. *See generally* a copy of the signature page accompanying Griswold's PHRC Complaint, attached hereto as Exhibit 31; Compl. ¶ 15.

76. On or about December 17, 2019, Griswold was interviewed by Detective Charles Lashley of DUCOM's Public Safety Department. Lashley Dep., Ex. 29, at 55:13-16; Pltf. Dep., Ex. 1, 144:3-11; Compl. ¶ 99.

77. Public Safety closed its investigation on January 24, 2020, with a determination of Closed/Cleared. Lashley Dep., Ex. 29, 89:23-90:24; Lashley's Supplemental Case Report, Ex. 28, at p. 1.

### H. Facts Material to Griswold's Failure-to-Retain Claim

78. Griswold alleges that, unlike several male physicians who had worked alongside her in the emergency medicine department—namely Hamilton, Dr. Michael Pasirstein ("Pasirstein"), and Dr. Ted Corbin ("Corbin")—she was not given an opportunity to be rehired or otherwise stay on in any capacity after January 14, 2020. Pltf. Dep., Ex. 1, at 212:20-213:19; Compl. ¶¶ 109-111.

79. In February of 2020, Defendants rehired Hamilton as chair of their emergency medicine department, albeit in a part-time capacity. *See* Hamilton Dep., Ex. 13, at 205:11-209:17; *see also* Defendants' Response to Plaintiff's Interrogatory No. 14, attached hereto as Ex. 7.

80. Hamilton accepted a full-time position with Crozer Health in the fall of 2019. Hamilton Dep., Ex. 13, at 207:17-209:17.

81. Hamilton continues to receive a monthly stipend from DUCOM but is not eligible for a salary or employee benefits. *Id.* at 205:8-21.

82. In connection with his limited role at Drexel, Hamilton works, at most, one day a week. *Id.* at 206:7-16.

83. Before Defendants placed Griswold on administrative leave on October 29, 2019, for threatening to burn down the New College Building, Griswold reached out to Richman and Van Bockstaele to discuss the possibility of finding a new role that would allow her to continue to serve as the director of the MSMS program after January 14, 2020, the effective termination date of her employment. Van Bockstaele Dep., Ex. 12, at 111:19-115:19 and exhibit cited therein.

84. Although Richman admits to having "several conversations" with Griswold about the future of the MSMS program in the summer and fall of 2019, Richman made no promises that Griswold could stay on as the MSMS program director after January 14, 2020. Richman Dep., Ex. 9, at 38:1-41:1.

85. Richman did not discuss the parameters of a new position with Griswold. *See id.*

86. Richman did not discuss whether the new position would be part-time or full-time. *Id.* at 47:16-48:14

87. Richman did not discuss salary, benefits, or a start date with Griswold. *Id.*

88. After Griswold was placed on administrative leave on October 29, 2019, Van Bockstaele and Griswold did not have an opportunity to meet and discuss the possibility of securing another role or what that role would entail in terms of compensation and structure. Van Bockstaele Dep., Ex. 12, at 148:2-6.

89. Griswold would not have been able to continue on as the director of the MSMS program and related certificate programs without a full-time appointment in DUCOM. Van

Bockstaele Dep., Ex. 12, at 159:11-163:10; *see also* relevant portions of DUCOM's faculty bylaws, attached hereto as Exhibit 32, at p. 34 (stating that "Faculty members of the Graduate School [of Biomedical Sciences and Professional Studies] *shall* hold academic appointments in the College of Medicine and are subject to the authority of the primary Department Chair or designated supervisor for at-large faculty for all matters related to the Faculty member's appointment, promotion, and tenure.") (emphasis added).

90. Pasirstein was offered a position in DUCOM's Office of Educational Affairs on or about December 19, 2019, to continue on as the director of the Emergency Medicine Department's clerkship program. *See* Offer Letter attached hereto as Exhibit 33.

91. Pasirstein accepted this offer on January 5, 2020. *Id.*

92. On August 31, 2020, Corbin was offered a position as Associate Dean for Community and External Affairs and an appointment as Clinical Professor of Health Management and Policy at the University's Dornsife School of Public Health. *See* Offer Letter attached hereto as Exhibit 34.

93. Corbin accepted this offer on September 15, 2020. *Id.*

94. At the end of the 2020-2021 academic year, the University sunsetted the MSMS and related certificate programs. *See supra* ¶ 24 and record evidence cited therein.

95. All but one MSMS student have graduated from the MSMS program. McGonigle Dep., Ex. 11, at 112:1-11.

96. Defendants intend to permanently shutter the MSMS program once the remaining student graduates. *Id.*

97. On January 14, 2020, Griswold inquired about her employment status via email directed to Katie Shannon. *See* Pltf. Dep., Ex. 1, at 212:8-19 and Exhibit 21 cited therein.

98. On January 16, 2020, Shannon advised Griswold via letter as follows:

> As you are aware, you were placed on administrative leave on October 29, 2019, during an investigation into a complaint filed against you regarding a possible University policy violation. Public Safety has concluded their investigation and has determined that there were no findings. Therefore, your administrative leave has ended effective January 14, 2020.
>
> As you were made aware on July 18, 2019, in the form of a letter from Dean Schidlow, due to the closure of Hahnemann University Hospital, your full-time faculty position in the department of Emergency Medicine is terminated on January 14, 2019.

*See* the letter dated January 16, 2020, addressed to Griswold, attached hereto as Exhibit 26.

99. Defendants' terminated Griswold's faculty appointment, along with those of hundreds of other faculty members, on January 14, 2020, because of the financial exigency caused by HUH's closure. *See id.*; *see also* the termination letter attached hereto as Exhibit 25; Defendants' response to Plaintiff's Interrogatory No. 7, attached hereto as Exhibit 7.

Respectfully submitted,

**BUCHANAN INGERSOLL & ROONEY**

/s/ Charlene A. Barker Gedeus
Charlene A. Barker Gedeus, I.D. No. 317896
Monica L. Simmons, Esquire, I.D. No. 323605
Two Liberty Place
50 S. 16th Street, Suite 3200
Philadelphia, PA 19102-2555
*Attorneys for Defendants*